IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs, at Knoxville, November 28, 2017

## STATE OF TENNESSEE v. REBECCA MICHELLE ROBINSON

**Appeal from the Circuit Court for Lawrence County**
**No. 33216          J. Russell Parkes, Judge**

_____

### No. M2016-01957-CCA-R3-CD

_____

A Lawrence County jury convicted the Defendant, Rebecca Michelle Robinson, of vehicular homicide by intoxication, reckless endangerment, and failure to exercise due care while operating a motor vehicle. The trial court sentenced her to an effective sentence of eight years of incarceration. On appeal, the Defendant contends that the trial court erred when it denied her an alternative sentence and ordered that she serve her sentence in confinement. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

Ronald G. Freemon, Columbia, Tennessee, for the appellant, Rebecca Michelle Robinson.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Gary M. Howell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

A Lawrence County grand jury indicted the Defendant for vehicular homicide, driving under the influence ("DUI"), reckless endangerment, and failure to exercise due

care while operating a motor vehicle. At trial, the proof viewed in the light most favorable to the State proved:[1]

Alexandria Niedergeses was in Sunday school with her mother and brother on Sunday morning, December 7, 2014. She described the roadway near the church, saying that it had two lanes traveling in each direction and also a turning lane, for a total of five lanes. Near the end of Sunday school, Ms. Niedergeses learned that there had been a "really bad" accident. Church members came into her Sunday school class to get her mother and brother, who were both nurses, to come and render assistance. When Ms. Niedergeses went to see what had happened, she saw that a vehicle was across the road crashed into another building. Her mother and brother went to render aide to the vehicle's occupant, Danny Pennington, who was also a church member.

Ms. Niedergeses saw that a truck had crashed into a van on the parsonage side of the church, and she heard people say that there were children in the vehicle. Ms. Niedergeses went to the truck where she saw three young girls and their mother, whom she later identified as the Defendant, all outside the vehicle. The children were not wearing shoes despite the cold temperature. Ms. Niedergeses and another lady from the church brought the Defendant and her daughters back to the church to stand inside. The girls were "very upset" and one, who had a "really large knot" on the top of her head, seemed disoriented. The Defendant left her daughters in the room with Ms. Niedergeses saying she had to go back and get her purse from the truck. The Defendant returned approximately five to ten minutes later. When the Defendant returned, she went to the restroom for some period of time.

Cynthia Pusser was also at the church the morning of the accident. She said that she arrived shortly after the accident. She heard a young girl say "Ms. Cynthia," and she recognized the three young girls who had been in the truck as students at the school where she was a teacher. She attempted to make the girls comfortable, noting that she did not see their mother, the Defendant, at the time. When the Defendant arrived, she appeared "shaken" and sat on the side of the table opposite Ms. Pusser and the three girls.

Ms. Pusser recounted that the children told Officer Larry Glass, who responded to this accident scene, that they were not wearing seatbelts when the accident occurred. The children were taken to an ambulance, and the children's grandmother arrived and waited for them to be released. Ms. Pusser said that the Defendant never asked about the occupants of the other vehicle involved in the accident.

---

[1]The Defendant does not appeal the sufficiency of the evidence against her and only appeals her sentence. We will, therefore, summarize the facts as presented at trial in the light most favorable to the State.

2

Janice Wade was in Sunday school at her church when she heard a loud noise outside. When someone informed her that there had been a car accident, she went into the room where the children were located. Ms. Wade noted that the Defendant was in the bathroom when Officer Glass arrived. Officer Glass knocked on the bathroom door and told the Defendant that she needed to come out. The Defendant exited the restroom carrying a large canvas-like tote. Officer Glass asked the Defendant for her driver's license and insurance, and the Defendant told him that her license was suspended. Ms. Wade opined that the Defendant did not appear concerned about the children, explaining that the Defendant said that she had been in the bathroom checking on her own bruises and shin and did not ask about the children.

Larry Glass, an officer with the Loretto Police Department, responded to the call about this car accident, and he arrived at the scene at 9:49 a.m. He saw that one vehicle had struck the Family Care Clinic in Loretto, and noted that a bystander was performing CPR on the driver, Mr. Pennington, when the officer arrived. Officer Glass opined that Mr. Pennington was in critical condition and called for an ambulance. Officer Glass said that there was a second vehicle, a maroon Chevrolet Silverado 1500, crashed across the highway. The vehicle was unoccupied, and Officer Glass was summoned to the church where the driver and her children were located.

When Officer Glass entered the church, he saw the three children in a classroom with women from the church. He learned that the Defendant was in the bathroom, so he knocked on the door and asked her to come out. He spoke with the Defendant, who told him that the accident occurred because her three children were "acting up" while she was driving, so she had turned around to talk to them. When she turned back, she saw a vehicle in front of her. She applied her brakes but could not stop her vehicle.

Officer Glass noted that the Defendant was unable to recollect where the children were located in the truck at the time of the accident and that her daughter had to tell him that information. The Defendant told him that the children were buckled in, but her daughters contradicted that statement. The Defendant then said to the children "you mean you weren't buckled up?" Officer Glass noted that there were not child safety or booster seats in the truck, and he later determined that the children were ages 4, 7 and 9, respectively. State law required that the four-year-old be restrained in a child safety seat.

The Defendant produced her driver's license, which was expired. The Defendant told him that she did not have insurance and that the vehicle belonged to her mother who was buying it. The tags on the vehicle were expired.

Officer Glass walked the Defendant to an ambulance where she was asked to submit to a blood alcohol test, which she agreed to do. The EMTs drew her blood and

3

Officer Glass locked it, sealed, in his car until he turned it into the city recorder, who mailed the sample to the Tennessee Bureau of Investigations ("TBI") for testing.

Officer Glass noted and marked the point of impact, under which there were gouge marks in the asphalt. Officer Glass learned that Mr. Pennington had died of his injuries. Officer Glass said he found no signs of illegal activity in the vehicle. He also did not offer the Defendant any field sobriety tasks, saying that he could not tell that she was impaired.

Trooper Harold Stewart of the Critical Response Incident Team ("CRIT") division of the Tennessee Highway Patrol testified as an expert witness in crash reconstruction. He investigated this case and determined that the Defendant's truck was traveling more than fifty-nine miles per hour at the time of impact and that she applied her brakes before impact. The speed limit for the roadway was forty-five miles per hour. He explained to the jury the basis for his estimation of her speed and also that, because the Defendant applied her brakes before impact, she was going in excess of fifty-nine miles per hour before she applied her brakes.

Michael Pope, who was a criminal investigator for the City of Loretto at the time of these events, testified that he was assigned to contact and interview the Defendant. He had some difficulty locating where the Defendant lived. He had to go to the school system, find the Defendant's mother, who contacted the Defendant for him, and the Defendant then came for an interview. Officer Pope provided the Defendant her *Miranda* rights, which she waived, and then video recorded the interview.

At one point during the interview, the Defendant wrote down her own statement. The State read the statement into the record as follows:

> My mother called me and woke me up Sunday morning between 6:00 or 7:00 and asked me to bring a truck that she had parked at home and bring to her home because her freezer had stopped working and asked me to pick up some Diet Pepsi on my way down. I got up. Got kids dressed and myself, left house. Stopped at Braisers Gas Station, got gas. Went and picked up drinks. Let the kids look around. I looked around a little. Loaded kids up at Wal-Mart. As I was loading them up my oldest daughter told me that something was dripping on my truck. I looked though, it was only water. Then I got in truck and reached behind, buckled up the baby. Made sure other two were buckled. Started for mom's. Headed down highway. A little ways before church the kids started fighting over a tablet. I turned around to tell the kids to stop fighting and to buckle back up because if didn't, when I pulled over up the road at the next store, they were

4

going to be in big trouble and was trying to get them to hand me the tablet. Then my oldest daughter screamed, Mom. I turned around and we were right on top of the truck. I slammed on the brakes and the truck wouldn't stop. Hit the truck, then hit my head, all the while I was still hitting brakes. I went to the right off in grass. My little daughter flew in the front seat and I grabbed at her as we hit the van in the parking lot. Then people from church pulled us out and took us in church. I checked on kids, went to bathroom to finish peeing because when I hit, I peed on myself some. The ambulance came took me, drawed [sic] blood and took us to hospital.

The State offered, and the trial court admitted, the video and audio recording of the Defendant's statement to Officer Pope. On the video, the Defendant is first given her *Miranda* warnings, and she signed a document waiving those rights. The statements made by the Defendant largely conform to her written statement. In addition to the information in her written statement, she added that after the initial impact, the "baby was flying," and the Defendant was trying to grab her while also trying to stop her own truck. She could not get it stopped so she hit another van. The Defendant said that she hit her own head.

About the drugs in her system, the Defendant said she had not taken anything the morning of or the day before this accident. She said she had not even taken "her medication," which was Lortab. She said that, prior to that, she had been to a party on Thursday or Friday, she took two or three Xanax pills and Lortab. She said she did not have a prescription for Xanax. The Defendant said she may have also taken Adderall at the party on Friday. The Defendant said that, on Friday, she took Lortab as prescribed for her to treat two ruptured discs in her spine. The Defendant said that she did not take any pills on Saturday before this accident on Sunday or on the day of this accident.

TBI Agent April Bramlage testified that the testing of the Defendant's blood returned positive for the presence of amphetamine (Adderall) at a level of .23 micrograms per milliliter, alprazolam (Xanax) at a level of 31 nanograms per milliliter, hydrocodone or dyhydrocodone (Loritab) at a level of .05 micrograms per milliliter, and Lidocaine. The amount of hydrocodone was small. Agent Bramlage described the effect that these drugs would have on a person who had taken them, saying that Adderall is used to treat ADD and can be effective in helping someone with or without ADD focus. She said that, if taken in a larger dose, it can cause one to be over stimulated. When "coming down" from the over stimulated state, one would feel and look very tired. The amount of Adderall in the Defendant's blood was significantly higher than the .03-.11 therapeutic range.

Agent Bramlage testified that Xanax was an anti-anxiety medicine meant to have a sedative effect. She said it slowed down the brain's cognitive functions. The amount of Xanax in the Defendant's blood fell within the therapeutic range of 25 to 102 nanograms per millimeter.

Agent Bramlage said that when one took both the stimulant Adderall and the depressant Xanax at the same time they would have effects from both drugs. The person might experience excitability, agitation, and have large dilated pupils from the amphetamine. She could not say how it would affect someone's ability to drive.

Thomas Deering, the doctor who performed the autopsy on Mr. Pennington's body, testified that Mr. Pennington died as a result of multiple blunt force injuries consistent with this car accident. Dr. Deering said that Mr. Pennington may not have been wearing a seat belt at the time of impact as his body did not show any signs of seatbelt marks.

For the Defendant, Susan Daughtry, a paramedic with the Lawrence County EMS, testified that she responded to this accident where she assessed the Defendant's injuries. Ms. Daughtry found the Defendant "alert and oriented." She said the Defendant was upright and walking, and her pupils were normal.

Based upon this evidence, the jury convicted the Defendant of vehicular homicide by intoxication, reckless endangerment, and failure to exercise due care while operating a motor vehicle.

### B. Sentencing

At the sentencing hearing, the trial court recounted that the Defendant had been convicted of vehicular homicide, a Class B felony, reckless endangerment, a Class E felony, and violation of the due care law, a Class C misdemeanor. The trial court stated that the Defendant's applicable range of punishment for the Class B felony was eight to twelve years, for the Class E felony was one to two years, and for the Class C misdemeanor was up to thirty days.

Jan Staggs, Mr. Pennington's sister, testified that Mr. Pennington was her "[b]aby brother." She said that Mr. Pennington was sixty-four years old at the time of his death and that he died in front of the church where he was a member. She read a prepared statement in which she described Mr. Pennington as a man of faith and a patriot who had served in the military. Ms. Staggs said that Mr. Pennington worked as a security guard, and he built furniture as a hobby and was an animal lover. Ms. Staggs described Mr. Pennington's pride at becoming a grandfather for the first time shortly before his death.

Ms. Staggs expressed frustration, stating that this accident never should have happened. Ms. Staggs stated that the Defendant, even if in jail, will get to keep living while Mr. Pennington's opportunity to live had been taken from him. It caused her turmoil to know that while her brother was dying, the Defendant never even asked about his welfare. Ms. Staggs testified that Mr. Pennington had intended to help with his daughter's wedding and to give her away at the wedding, but he died before he could do either.

Blake Grooms, a detective with the Lawrence County Police Department, testified that he was a K-9 officer and, more recently, a narcotics investigator. Detective Grooms testified that the biggest drug problems in the county were caused by prescription pills and methamphetamine. He said that his department would go bankrupt if it attempted to investigate all of the prescription pill cases. Detective Grooms described the most abused drugs as: Oxycodone, Oxycontin, Xanax, Percocet, Phentermine, Adderall, and Ritalin.

The Defendant gave a statement of allocution in which she apologized to the Pennington family, saying that she never intended to hurt Mr. Pennington or her own children. She said she thought about the accident every day and what she could have done to avoid it.

Based upon this evidence, the trial court found:

> I have reviewed, again, today, not only the Court file but specifically some of the exhibits. I refer to Exhibit 11, which was received, which was the official toxicology report. It said at the time of the taking of the blood sample, [the Defendant] had in her system amphetamines, Alprazolam, and Hydrocodone. I've also considered not only the pre-sentence report but all the victim impact statements, the principles of the Sentencing Act, all sentencing alternatives, the nature and characteristics of the criminal conduct of the [D]efendant, the proof as to mitigating and enhanc[ement] factors, which I will specifically, or more specifically, address in a moment, also the statistical information provided by the administrative offices of the Court relative to the sentencing in all Class B Felonies in this particular state.

Addressing the enhancement and mitigating factors the trial court stated:

> I will not refer to enhanc[ement] factor number 3, the offense involved more than one victim. I find that that particular enhanc[ement] factor would apply. Enhanc[ement] factor number 4, a victim of the offense was particularly vulnerable because of age, or physical, or mental disability. I

7

find that that particular enhanc[ement] factor is, in fact, applicable in this case.

The trial court found no other applicable enhancement or mitigating factors. The court then stated:

> I would be remiss in not providing this record with an observation as it relates to the sentencing report and that is, under the prior criminal history while certainly not extensive and while not even having any felony or significant misdemeanor convictions, [the Defendant] was charged with a seat belt violation, having children in her vehicle of 18 years or older on 3/30/2013 and pled guilty May 10th, 2013, prior to the return of this indictment.

> She was, again, charged with a seat belt violation on 7/19/13 having pled guilty on September 13th, 2013, and at that time charged with child restraint, not having a child restraint in her car, or not having children in the car in a child restraint, having pled guilty to those offenses also.

> And then yet, again, on this particular day, [the Defendant], the proof I believe is uncontroverted that none of these children were in any form of child restraint and/or were not buckled. In fact, the proof was that one of these children at the time of impact or immediately thereafter flew through between the seats and into the front of the car or vehicle. I also find that [the Defendant]'s actions immediately after this particular offense showed some call[o]us disregard not only for Mr. Pennington, but also for these particular children.

> The undisputed proof in this particular case is also directly contrary to the statements provided by [the Defendant] after the offense and when she was interviewed by the officer trying to indicate or tell these officers that she may have these particular drugs in her system but they were from days and/or nights before when she was partying.

The trial court then sentenced the Defendant to the minimum sentence of eight years for the Class B felony, to eighteen months for the Class E felony, and to ten days for the Class C misdemeanor. The trial court ordered that these sentences all run concurrently.

The trial court then discussed the probation considerations, finding:

8

I have reviewed the pre-sentence report, the victim impact statements, the [D]efendant's physical and mental condition and social history, the facts and circumstances surrounding the offense, and the nature and circumstance of the criminal conduct involved.

I find in light of the prior child restraint issues and/or issues which I believe were patently obvious in this case including the presence of not just one, two, but three drugs in this particular case. That would weigh against probation in this particular case. The prior criminal history of the [D]efendant, or lack thereof, to the extent that I weigh that in favor of or against probation, I find that the lack of criminal history would weigh in favor of probation.

The Court must also review and weigh the previous actions and/or character of the [D]efendant. I find that weighs slightly against the [D]efendant in this particular case. I find that the [D]efendant's action and the character of the [D]efendant in not only having used one drug, not two, but three illegal drugs on that particular day weigh against this particular grant of probation or a particular grant of probation, whether or not the [D]efendant might reasonably be expected to be rehabilitated and the [D]efendant's potential or lack of potential for rehabilitation including the risk that during the period of probation, the [D]efendant will commit another crime. The Court does not find that that weighs in favor of or against the [D]efendant.

Whether or not it reasonably appears that the [D]efendant will abide by the terms of probation, the Court is troubled, and, in fact, I find and have observed, made the observations in the pre-sentence report regarding this particular [D]efendant having pled guilty on multiple occasions to child restraint devices or child restraint violations. And, in fact, on that particular day, none of these children were buckled or in a child restraint device.

Whether or not the interests of justice is being protected from possible future criminal conduct in the defendant are great. I find that weighs in favor of the [D]efendant. Whether or not measures less restrictive than confinement have frequently or recently been applied or unsuccessfully to the [D]efendant weighs not in favor or . . . against probation. Whether or not a sentence of full probation would unduly depreciate the seriousness of the offense, I find it weighs against the grant of probation in this particular case.

9

And I find that confinement is particularly suited to provide an effective deterrent to others likely to commit this particular offense. This particular offense is not just inclusive of vehicular homicide. The undisputed proof before this Court today is that there is a growing problem relative to the use and/or abuse of prescription drugs by individuals for whom those prescriptions had not been given.

I thus find that the [D]efendant[] . . . is not a suitable candidate for probation. I impose a sentence of eight years in the Tennessee Department of Correction. The sentences will run concurrent[ly] with each other for an effective eight year sentence.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends the trial court erred when it denied her an alternative sentence. She notes that in the trial court's ruling, it concluded that several factors weighed in her favor. She further contends that the trial court erred when it considered some of the elements of vehicular homicide when it denied her an alternative sentence. The Defendant lastly contends that the trial court improperly concluded that confinement was necessary on the basis of deterrence. The State counters that the trial court acted within its discretion when it denied the Defendant's request for an alternative sentence. We agree with the State.

The standard of review for questions related to probation or any other alternative sentence is "'an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act.'" *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (citing *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court's decision regarding probation will only be invalidated if the court "wholly departed from the relevant statutory considerations in reaching its determination." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014). Under an abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Id*. at 475.

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) (2014) provides as follows:

In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the

10

laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. T.C.A. § 40-35-303(a) (2014). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he or she is a suitable candidate for probation. T.C.A. § 40-35-303(b) (2014); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App.1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. *Bingham*, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis considering "the nature of the offense and the totality of the circumstances . . . including a defendant's background." *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (quoting *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1) (2014). "When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public." *State v. Brian Allen Cathey*, No. E2015-01284-CCA-R3-CD, 2016 WL 2641766, at *3 (Tenn. Crim. App., at Knoxville, May 6, 2016) (citations omitted). The court should also consider the defendant's truthfulness. *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). The trial court must also consider the

11

potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed.  T.C.A. § 40-35-103.

The record supports the trial court's findings in this case.  While the Defendant was eligible for probation in that her effective sentence was eight years, the trial court's decision to deny an alternative sentence was based upon statutory factors.  The trial court found that the Defendant had twice previously been convicted of having children unrestrained in the car and that her children were unrestrained on this occasion.  It found that she was not forthcoming about the timing of her drug use and that she showed a disregard for the man that she killed and her own children after the accident.  The trial court also determined that confinement was necessary to avoid depreciating the seriousness of this offense and also for deterrence in Lawrence County, which was suffering from numerous prescription pill related offenses.  These factors are all well-supported by the evidence.  The Defendant has failed to carry her burden of proving suitability for probation.

The trial court carefully and thoughtfully considered the pertinent facts of this case and the appropriate sentencing principles and denied alternative sentencing.  The Defendant has not established that the trial court abused its discretion by denying her request for an alternative sentence.  The Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude the trial court properly denied the Defendant an alternative sentence.  As such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

12